**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**CONNIE SUE HOWERTON,**

      **Plaintiff,**

**v.**                                                              **Case No.: 5:16-cv-01026**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 12, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that is requests remand of the Commissioner's decision, (ECF No. 12); that the Commissioner's

motion for judgment on the pleadings be **DENIED**, (ECF No. 13); that the decision of the Commissioner be **REVERSED**; that this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   Procedural History

On January 7, 2010, Plaintiff Connie Sue Howerton ("Claimant") protectively filed an application for DIB, alleging a disability onset date of July 17, 2006 due to rheumatic heart disease, rheumatoid arthritis, a brain tumor, "nerves," fibromyalgia, and headaches. (Tr. at 328-34, 382). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 99, 126-30). Claimant subsequently filed a request for an administrative hearing. (Tr. at 145-46). An initial and two supplemental hearings were held on November 15, 2011; May 30, 2012; and September 11, 2012, respectively, before the Honorable Robert S. Habermann, Administrative Law Judge ("ALJ Habermann"). (Tr. at 33-60, 61-74, 91-97). During the third hearing, Claimant orally moved to amend her alleged onset date to September 28, 2009. (Tr. at 96). ALJ Habermann issued a decision on September 17, 2012 determining that Claimant was not disabled as defined in the Social Security Act. (Tr. at 100-20).

However, the Appeals Council remanded the case, directing the ALJ to resolve the following issues: (1) determine whether Claimant was disabled from the amended onset date of September 29, 2009[1] through December 31, 2010 (as opposed to

_____

[1] Claimant orally amended her alleged onset date to September 28, 2009 during the hearing. (Tr. at 96). However, in its Order, the Appeals Council misstated the date to be September 29, 2009 and the ALJ used the amended alleged onset date of September 29, 2009 in the decision that is presently under review. (Tr. at 123). Claimant does not raise any challenge relating to the date of onset. (ECF No. 12).

December 31, 2009, which ALJ Habermann incorrectly considered to be the date last insured); (2) obtain evidence from a medical expert to clarify the nature and severity of Claimant's impairments, if necessary; (3) give further consideration to Claimant's RFC and provide rationale and citations to the record to support the assessed limitations; and (4) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Claimant's occupational base. (Tr. at 122-23).

Therefore, a fourth administrative hearing was held on August 11, 2014 before the Honorable William Paxton, Administrative Law Judge ("the ALJ"). (Tr. at 75-97). By written decision dated August 28, 2014, the ALJ likewise found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-32). The ALJ's decision became the final decision of the Commissioner on December 9, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a reply. (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 44 years old on her alleged disability onset date and 46 years old on her date last insured. (Tr. at 251). She communicates in English and completed the twelfth grade. (Tr. at 381, 383). Claimant previously worked as a manager at a fast food restaurant and a manager at a restaurant/convenience store. (Tr. at 384).

III.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments

do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in

the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2010. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 29, 2009, her amended alleged disability onset date, through her date last insured. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "rheumatic mitral valve disease, status post valvuloplasty; coronary artery disease, status post stenting; fibromyalgia; and anxiety disorder NOS." (Tr. at 16-17, Finding No. 3). The ALJ considered and found non-severe Claimant's right wrist pain, asthma, and headaches. (Tr. at 16-17). He also determined that Claimant's osteoarthritis of her left knee, hypertension, and hyperlipidemia remained stable with treatment and produced no significant symptoms; further, despite Claimant's claimed problems with attention and concentration, the ALJ found that cognitive impairment was not medically determinable. (Tr. at 17).

Under the third inquiry, the ALJ found that Claimant did not have an

impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-19, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could never perform climbing of ladders, ropes, or scaffolds. She could occasionally perform balancing, kneeling, stooping, crouching, crawling, and climbing of ramps and stairs. She must avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and all exposure to hazards, such as heights and machinery. She is limited to performing routine, repetitive, tasks; understanding, remembering, and carrying out simple instructions; performing work without specific production quotas or a rapid pace; and interacting only occasionally with the public.

 (Tr. at 19-23, Finding No. 5). At the fourth step, the ALJ found that through the date last insured, Claimant was unable to perform her past relevant work as a hostess and assistant manager. (Tr. at 23, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 23-24, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on her date last insured; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 23, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 23-24, Finding No. 10). At the sedentary exertional level, Claimant could perform unskilled work as an addresser, order clerk, and assembler. (*Id*). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 24, Finding No. 11).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises a single challenge to the Commissioner's decision. She argues that new evidence from her cardiologist, Jebran Karam, M.D., FACC, which was submitted to the Appeals Council and incorporated into the record, warrants reversal or remand of the ALJ's decision. (ECF No. 12 at 9). Claimant contends that the new evidence from Dr. Karam disproves the ALJ's statements regarding the progression and treatment of her cardiac impairments in 2010 and explain a presumed gap in her treatment, which is important because the ALJ questioned the severity of Claimant's cardiac impairments based on "conservative care" and a treatment gap. (*Id.* at 12). In addition, Claimant states that the additional records "paint a much grimmer picture" of her cardiac impairments than what the ALJ presented in the decision and provide critical information for the evaluation of her cardiac impairments under Listing 4.04. (*Id.* at 12-13).

In response to Claimant's brief, the Commissioner contends that Claimant has not proven that she is disabled under the Act. (ECF No. 13 at 9). Further, the Commissioner argues that the additional treatment notes from Dr. Karam are not "new" or "material" evidence that requires remand, and they are consistent with the RFC limiting Claimant to sedentary work. (*Id.* at 1, 9-13). Finally, the Commissioner argues that Claimant failed to produce angiographic evidence necessary to meet Listing 4.04C during the relevant period. (*Id.* at 1, 13-15).

Claimant filed a reply to the Commissioner's brief, pointing out that when the Appeals Council incorporated Dr. Karam's records into the administrative record, the Council conceded that the additional records were "new" and "material" to the disability decision. (ECF No. 14 at 1). Claimant also disputes the Commissioner

"endeavor[] to provide a step three analysis on behalf of the ALJ." (*Id.* at 2).

## V.     Relevant Medical History

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to this PF & R are summarized as follows.

### A. Treatment Records

Claimant has a history of coronary artery disease and mitral stenosis due to rheumatic heart disease, which preceded and continued throughout her alleged period of disability. (Tr. at 490, 492, 661, 677, 939). In 2000, Claimant underwent cardiac catheterization, with stents placed in her right coronary artery. (*Id.*). Subsequently, in 2002, she had a mitral valvuloplasty, which was reportedly successful in improving her mitral valve area to 2.4 to 2.8 squared centimeters. (Tr. at 939).

On August 27, 2009, Claimant presented as a new patient to Access Health Rural Acres. (Tr. at 583). She was examined by Kimberly D. Ballard, D.O. (*Id.*). Claimant was not experiencing any symptoms, did not report any chronic pain, and had no current complaints. (*Id.*). She stated that she wanted to establish care and needed refills of her medications. (*Id.*). She had no chest pain or palpitations. (Tr. at 584). Her cardiovascular examination revealed regular heart rate and rhythm without murmur and normal carotid arterial and pedal pulses without bruits. (Tr. at 584). She was assessed with hypertension and rheumatic heart disease. (Tr. at 585). Dr. Ballard recommended that Claimant establish care with a local cardiologist, and she responded that she would consider it, but declined at that time due to cost. (*Id.*).

On September 28, 2009, Claimant presented for an office visit at Access Health Rural Acres complaining of dizziness. (Tr. at 580). She saw Amy Brown, D.O. (*Id.*). Claimant denied heart palpitations, and her cardiovascular examination revealed

9

regular heart rate and rhythm without murmur. Her peripheral circulation showed no edema. (Tr. at 581-82). Claimant's hypertension was improved, and her rheumatic heart disease appeared to be stable. (Tr. at 582). She was referred to cardiology for a consultation. (*Id.*).

On January 12, 2010, Claimant presented for another office visit at Access Health Rural Acres complaining of "problems with nerves." (Tr. at 576). She saw Tiffany K. Thymius, D.O. (*Id.*). Claimant's blood pressure was 124/78 and the only pain that she reported was in her right wrist. (*Id.*). She denied having any heart palpitations and her cardiovascular examination revealed regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without bruits, and her peripheral circulation showed no edema. (Tr. at 577-78). She received refills for Lipitor, Plavix, and Toprol. (Tr. at 579).

On February 18, 2010, Claimant presented for an initial cardiac consultation with Dr. Jebran Karam at Raleigh Cardiology Clinic. (Tr. at 938). Dr. Karam noted that Claimant had a history of coronary artery disease with prior cardiac catheterization and a stent placed in her mid-right coronary artery. (*Id.*). He also noted that Claimant had a history of severe mitral stenosis. She was treated with a balloon valvuloplasty, after which Claimant initially felt better, but reported that her symptoms gradually began worsening. (*Id.*). Dr. Karam stated that over the previous year, Claimant experienced dyspnea with mild exertion and had exertional heaviness and tightness that was relieved by rest. (*Id.*). Claimant also reported being very tired and having occasional skipped heart beats, but denied orthopnea or paroxysmal nocturnal dyspnea, dizziness, or syncope. (*Id.*).

Dr. Karam's impression was coronary artery disease, status post stenting, rule out progression; severe mitral stenosis due to rheumatic heart disease, status post successful balloon valvuloplasty in 2002, rule out progression; history of mild to moderate aortic regurgitation, rule out progression; history of moderate pulmonary hypertension, rule out progression; and history of hypertension, rule out left ventricular hypertrophy. (Tr. at 939). He ordered a thoracic echocardiogram and decided to obtain Claimant's laboratory results from Access Health Rural Acres. (Tr. at 939-40). Dr. Karam indicated that he was very concerned about Claimant's presentation and felt that she may have significant progression of her coronary artery disease and valvular disease. (*Id.*). He did not feel comfortable referring Claimant for a stress test. (*Id.*). He increased her medications and urged her to avoid exertion and to go to the emergency room if she experienced worsening symptoms. (*Id.*). Dr. Karam stated that he would review her echocardiogram results, but felt that Claimant would most likely require catheterization. Claimant expressed great hesitation due to the financial burden of the procedure, as she lacked insurance coverage. (*Id.*). Dr. Karam urged Claimant to cease smoking, explaining that with her age and cardiac risk factors, continued smoking would place Claimant at a significantly increased risk of acute coronary syndrome, sudden cardiac stroke, and death. (*Id.*).

On March 17, 2010, Claimant underwent the echocardiogram study ordered by Dr. Karam. (Tr. at 936). Dr. Karam interpreted the study to show aortic sclerosis without stenosis; mildly dilated right and left atria; normal right ventricular size and function with mild pulmonary hypertension; normal left ventricular size with ejection fraction of 60 percent with evidence of left ventricular dystolic dysfunction; small pericardial effusion; mild to moderate II/IV aortic regurgitation; at least moderate

mitral stenosis with mild regurgitation; mild tricuspid regurgitation; and mild pulmonary regurgitation. (Tr. at 937). Because the study was technically limited in assessing the mitral valve, Dr. Karam suggested a transesophageal echocardiogram ("TEE") to fully determine the degree of mitral valve disease.

On April 6, 2010, Claimant presented to Dr. Karam for a follow-up appointment. (Tr. at 933). She had no new cardiac problems. (*Id.*). She had baseline dyspnea on exertion that was unchanged; no chest pain or tightness on exertion since her prior visit; and no orthopnea, paroxysmal nocturnal dyspnea, dizziness, syncope, or focal weakness or numbness. (*Id.*). Claimant believed that her blood pressure and "labs" were well controlled. (*Id.*). Claimant's blood pressure was 132/76. (Tr. at 934). Dr. Karam planned to rule out progression of Claimant's coronary artery disease. (Tr. at 934). He opined that her mitral valve disease was becoming "very significant" and probably required further intervention, but to confirm, he would refer her for a TEE, which would allow him to better evaluate her mitral and aortic valves. (*Id.*). Dr. Karam felt, depending on the TEE results, that Claimant might require a right and left catheterization. (*Id.*). Dr. Karam noted that Claimant was very concerned about the financial cost of the procedure, as she was denied Medicaid and was still pursuing benefits through the SSA. (Tr. at 934-35). Claimant was to follow up with Dr. Karam in three months or "much earlier" if she elected to have the procedure or obtained insurance. (*Id.*).

On May 11, 2010, Claimant underwent a left ventriculography and intravascular ultrasound-guided cardiac catheterization performed by Elie Gharib, M.D. (Tr. at 638). Dr. Gharib documented that he placed two stents, one in the circumflex artery and one in the diagonal 1 branch of the left anterior descending ("LAD") artery. Dr. Gharib

found diffuse 30%-40% stenosis in the LAD, with 60%-70% proximal stenosis in the diagonal 1 branch. He also found 30%-40% diffuse stenosis in the first obtuse marginal branch and ostial, with 66% stenosis in the circumflex artery. (Tr. at 639). Claimant had normal left ventricular function with ejection fraction estimated at 70 percent with normal wall motion. (*Id.*). Dr. Gharib recommended aggressive medical management and risk factor modification, as well as the use of Plavix and aspirin. (*Id.*). He suggested that other causes for Claimant's chest pain be explored, as she complained of constant pain that did not resolve during pre and post-operative percutaneous coronary intervention (PCI). The x-rays of her chest showed no signs of acute infiltrates or signs of failure. (Tr. at 665).

On May 18, 2010, Claimant presented to Access Health Rural Acres, requesting a referral to a neurologist stating that she was experiencing headaches and had been diagnosed with a brain tumor three years earlier. (Tr. at 655). Claimant could not recall who diagnosed her with a brain tumor or where she had her prior brain scan performed. (*Id.*). Claimant reported that she felt "OK" since her stent surgery, but she continued to smoke. (*Id.*). Her cardiovascular examination demonstrated regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without bruits, and her peripheral circulation showed no edema. (Tr. at 656). Her hypertension and rheumatic heart disease were stable. (*Id.*). An MRI was ordered, and she was referred to neurology. (*Id.*).

On July 1, 2010, Claimant presented to Access Health Rural Acres with bilateral leg pain that she described as constant cramping pressure. (Tr. at 651). She discussed starting Chantix. (*Id.*). Her cardiovascular examination demonstrated regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without

bruits, and her peripheral circulation showed no edema. (Tr. at 652-53). Her hypertension was listed as stable, but her other chronic cardiovascular conditions were not noted on her assessment at this visit. (Tr. at 653).

On August 11, 2010, Claimant presented to Dr. Karam for evaluation of chest pain following her stenting procedure. (Tr. at 930). Dr. Karam noted that he last saw Claimant in the Spring, when Claimant contacted him and stated that she was able to go forward with the cardiac catheterization because she believed that her insurance company would cover 70 percent of the cost. (*Id.*). Claimant reported to Dr. Karam that she continued to experience chest pain, which she described as sharp, stabbing pain that lasted for hours without spontaneous resolution and which was not necessarily precipitated by emotional or physical stress. (*Id.*). Claimant stated that her dyspnea had significantly improved following the stenting procedure, but she admitted to continued smoking. (*Id.*). She denied any midsternal heaviness, tightness, orthopea, paroxysmal nocturnal dyspnea, dizziness, or syncope. (*Id.*). On examination, Claimant's blood pressure was 122/74, her arterial pulses were normal, and her jugular veins showed no distention or abnormal waves. (Tr. at 931).

Dr. Karam's impression was that Claimant had coronary artery disease, status post stenting and catheterization. (*Id.*). He noted that Claimant's prior procedures revealed a normal left main artery, 30 to 40 percent stenosis in the left anterior descending artery, 70 percent stenosis in the diagonal branch, 66 percent stenosis in the marginal artery, with nonobstructive disease in the right coronary artery. (*Id.*). Dr. Karam further noted that drug eluting stents were placed in the diagonal and marginal arteries. Claimant had stable angina and her chest pain was atypical and not believed to be cardiac in etiology. (*Id.*). Dr. Karam planned to rule out progression of Claimant's

14

moderate, if not severe, mitral stenosis due to rheumatic heart disease; mild to moderate II/IV aortic regurgitation; and mild tricuspid regurgitation. (*Id.*)

Claimant underwent an EKG, which was normal. (Tr. at 932). Based on that finding, Dr. Karam recommended cardiac risk modification, including compliance with diet, medications, exercise, and smoking cessation. (*Id.*). He also advised Claimant to follow up with her primary care provider to ensure continuous medical care and routine laboratory work in view of possible side effects from her prescribed medication. Dr. Karam suggested that Claimant discuss her chest pain with her family physician for noncardiac workup, as the pain could be related to her fibromyalgia. (*Id.*).

On August 11, 2010, Dr. Karam summarized in a letter to Claimant's primary care physician the findings and recommendations from his consultative cardiac evaluation of Claimant. (Tr. at 661). He noted that Claimant's chronic problems included, *inter alia,* coronary artery disease, status post stenting, with stable angina; severe mitral stenosis due to rheumatic heart disease, rule out progression; mild to moderate II/IV aortic regurgitation, rule out progression; mild tricuspid regurgitation with mild pulmonary hypertension, rule out progression; continuous tobacco abuse with dyspnea; and hypertension with left ventricular hypertrophy. (*Id.*). He further noted that Claimant's EKG was normal with no significant changes. (Tr. at 661). However, Dr. Karam stated that he had wanted to do a TEE to assess Claimant's mitral valve disease, but because she had received drug eluting stents during her recent catheterization, he could not do an invasive intervention at that time. Based on her current studies, Dr. Karam decided to wait and reevaluate the status of Claimant's mitral valve disease in March 2011. Dr. Karam also indicated that Claimant was advised to discuss her chest pain with her primary provider for "noncardiac workup," as it was

believed to not be cardiac in etiology and could be related to her fibromyalgia. (*Id.*). Claimant was instructed to stop smoking and was advised of the importance of maintaining proper blood pressure and lipid profile. (*Id.*).

Shortly after Claimant's date last insured, on February 2, 2011, Claimant had a routine follow-up office visit at Access Health Rural Acres. (Tr. at 647-48). Claimant was tolerating her medications "OK" without side effects and her chronic problems were stable without any new changes. (Tr. at 648). She denied heart palpitations, chest pain, or shortness of breath. (*Id.*). Her cardiovascular examination demonstrated regular heart rate and rhythm without murmur, normal carotid arterial and pedal pulses without bruits, and her peripheral circulation showed no edema. (Tr. at 649). Claimant received refill prescriptions for her "chronic maintenance medications" and was instructed to obtain the diagnostic studies that were ordered and return to the clinic in four months. (*Id.*).

Thereafter, on April 13, 2012, Claimant presented to the Emergency Room with intermittent chest pain beginning that day, which varied from dull to the most severe pain and happened during rest. (Tr. at 757, 762). Her cardiac enzymes were abnormal. (*Id.*). She had stenosis of 77 percent in her LAD, 70 percent in her circumflex artery with 72 percent stenosis at its mid-segment, and 70 percent in the ostial segment of the obtuse marginal 1 branch. (Tr. at 822). She had normal left ventricular systolic function. (*Id.*). She underwent successful cardiac catheterization with IVUS-guided stenting to the LAD, first diagonal branch, circumflex, and obtuse marginal branch with drug-eluting stents. (Tr. at 757). There was no residual stenosis. (Tr. at 822). Claimant had eight stents placed in total. (Tr. at 832).

### B.  Evaluation and Opinion Evidence

On March 22, 2010, Atiya M. Lateef, M.D., completed a physical RFC assessment form. (Tr. at 590). Dr. Lateef opined that Claimant could perform work at the light exertional level with additional postural and environmental limitations. (Tr. at 592, 594).

On September 6, 2011, Gary Craft, M.D., performed a consultative examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 625). Claimant blood pressure was recorded to be 160/102, but her heart had normal rhythm and was free of gallop, murmur, click, or irregularity. (Tr. at 626-27). Dr. Craft noted that auscultation of the heart was negative, and he could not detect any peripheral arterial disease. (Tr. at 627). His long-term prognosis for Claimant's cardiovascular system was "fair." (*Id.*). As far as her ability to do work-related activities, Dr. Craft opined that Claimant was capable of frequently lifting and carrying up to 10 pounds, occasionally lifting and carrying up to 50 pounds, but never carrying over 50 pounds. (Tr. at 631). Claimant could sit for four hours, stand for three hours, and walk for two hours without interruption and she could sit for a total of 7 hours, stand for 6 hours, and walk for five hours in an 8-hour work day. (Tr. at 632). Claimant could continuously use her hands for all activities except that she could only frequently reach overhead and she could only frequently use her feet to operate foot controls. (Tr. at 633). Claimant also had some environmental and postural limitations. (Tr. at 634-35).

On January 24, 2012, Lee T. Besen, M.D., reviewed some of Claimant's medical records and provided an opinion letter to ALJ Habermann, noting that Claimant's cardiovascular disease was stable after the placement of two coronary stents in 2010 and prosthetic heart valve surgery in 2000. (Tr. at 718). Dr. Bensen stated that there

17

were no cardiac symptoms addressed in the data and opined that Claimant did not meet or equal any impairments in the Listing and did not have any functional limitations. (*Id.*). Dr. Bensen opined that Claimant could frequently lift and/or carry up to 20 pounds, occasionally lift and/or carry up to 50 pounds, and never lift over 50 pounds. (Tr. at 719). At one time without interruption, she could sit for two hours and stand and/or walk for one hour. (Tr. at 720). She could sit for 6 hours and stand or walk for two hours in an 8-hour workday. (*Id.*). She could frequently use her hands and feet and had other postural and environmental limitations. (Tr. at 721-23).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the

court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant contends that new evidence from her cardiologist, Dr. Karam, which was submitted to the Appeals Council and incorporated into the record, warrants remand of the ALJ's decision. (ECF No. 12 at 9). She argues that the new evidence, which consists of Dr. Karam's treatment records and test results during the relevant period, disproves the ALJ's statements regarding the progression and treatment of her cardiac impairments in 2010 and explain a presumed gap in her treatment, which is important because the ALJ questioned the severity of her cardiac impairments based on "conservative care" and a treatment gap. (*Id.* at 12). In addition, Claimant states that the additional records "paint a much grimmer picture" of her cardiac impairments than what the ALJ presented in the decision and provide critical information for the evaluation of her cardiac impairments under Listing 4.04. (*Id.* at 12-13).

Notably, Dr. Karam's consultative letter dated August 11, 2010 was included in the record before the ALJ; however, the ALJ neither referenced, nor discussed, the letter in his decision. (Tr. at 661). Dr. Karam's letter generally summarized his findings and recommendations based on cardiac evaluations of Claimant, although the letter did not contain all of the detail in his treatment notes and test results. (*Id.*).

Dr. Karam's treatment notes and test results from February, March, April, and August 2010 were submitted as new evidence to the Appeals Council, after the ALJ's decision and in the course of Claimant's request for review of the ALJ's findings. The Appeals Council accepted and incorporated Dr. Karam's records into evidence and considered them when looking at Claimant's request for review. Ultimately, the Appeals Council decided that the record, including the new evidence, did not provide

a basis to remand or alter the ALJ's decision. (Tr. at 1, 5).[2] Claimant contends that the Appeals Council erred, because the additional records from Dr. Karam conflicted with the ALJ's findings regarding Claimant's cardiac impairments.

As an initial matter, contrary to the Commissioner's position, Claimant is not required to prove that the treatment records are "new" or "material" evidence to prosecute her case. The undersigned assumes that any evidence expressly made part of the record by the Appeals Council was implicitly found to be new, material, and relevant to the time period in question. Therefore, given that the Appeals Council incorporated into the record the materials provided by Dr. Karam, the task now is to "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." *Flesher v. Colvin*, No. 2:14-CV-30661, 2016 WL 1271511, at *8-12 (S.D. W. Va. Mar. 31, 2016) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)).

To accomplish this task, the Court must first "focus on determining whether that new evidence 'is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports.' Where no such conflict is present, the case can be decided on the existing record without remand." *Id. (*quoting *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013); *see, also, Yost v. Astrue*, No. CIV. A. TMD-08-2942, 2010 WL 311432, at *3 (D. Md. Jan. 19, 2010) ("[W]hile

---

[2] As stated by the Appeals Council, it would grant review of Claimant's case for any of the following reasons: If the ALJ abused his discretion, there was an error of law, the decision was unsupported by substantial evidence, there was a broad policy or procedural issue that may affect the public interest, or the decision was contrary to the weight of all of the evidence in record considering the new and material evidence received by the Appeals Council. (Tr. at 1). However, it determined that none of those reasons existed in Claimant's case. (*Id.*).

evidence considered by the Appeals Council must have been found to be "material", *i.e.* a reasonable possibility that it would have changed the outcome, that alone clearly does not necessitate a finding at the district court level that the case be remanded. Rather, at this juncture, the Court's role is to determine whether the record, as whole (including that evidence considered by the Appeals Council), supports the Commissioner's findings.")).

Turning to the issue at hand, the undersigned considers whether the record as a whole, including the new evidence from Dr. Karam, supports the ALJ's decision. In the decision, the ALJ acknowledged that Claimant was diagnosed with severe mitral stenosis resulting from rheumatic heart disease and underwent a valvuloplasty in January 2000. (Tr. at 20). The ALJ stated that Claimant's cardiac testing was normal, and she had no potential cardiac symptoms until she reported dizziness in late 2009; further, the ALJ stated that "[e]ven at that time, the claimant denied receipt of any recent treatment by a cardiologist" and only followed up with her primary care physician who prescribed her medications. (*Id.*). The ALJ concluded that "[c]learly, the largely benign findings and conservative care related to the claimant's valve disease following the valvuloplasty demonstrates this condition did not lead to any of the extreme symptoms alleged by the claimant." (*Id.*).

As to Claimant's coronary artery disease, the ALJ discussed that the condition was successfully treated in May 2010 with cardiac catheterization and the placement of two stents. (*Id.*). The ALJ noted that through Claimant's date last insured, she did not seek "specialized cardiac treatment and her primary care physician [...] noted no reports of cardiac symptoms or objective cardiac abnormalities." (*Id.*). Overall, the ALJ found that Claimant's coronary artery disease was "treated successfully" during the

adjudicatory period, and she had no significant cardiac symptoms, which was "wholly inconsistent with the extreme limitations she alleged and thereby suggest[ed] her allegations are not entirely credible." (Tr. at 20-21).

While the undersigned agrees that the record as a whole supports several of the ALJ's conclusions, it does not support his factual assumptions that Claimant (1) had largely benign cardiac findings and (2) did not seek specialized cardiac treatment apart from her catheterization. Because these incorrect suppositions substantially affected the ALJ's determination of non-disability, the decision is not supported by substantial evidence.

To begin, Dr. Karam's records show that Claimant received specialized cardiac treatment in February, March, April, and August 2010. (Tr. at 930-40). The ALJ predicated his credibility finding, in part, upon Claimant's lack of formal cardiac treatment, despite the fact that Dr. Karam's consultative letter was in the record at the time of the ALJ's decision. (Tr. at 661). Nevertheless, whether the ALJ construed that letter to indicate a single consultative examination or failed to consider it entirely, the additional evidence unequivocally contradicts the ALJ's finding that Claimant did not receive specialized cardiac care. The ALJ's associated reliance on this finding to discredit Claimant's statements regarding the severity and persistence of her symptoms is, therefore, unsupported by substantial evidence.

Additionally, Dr. Karam's records provide significant information regarding the nature and extent of Claimant's symptoms during the relevant period. During her initial consultation with Dr. Karam in February 2010, Claimant reported that over the past year she had experienced dyspnea with mild exertion, as well as exertional heaviness. She also reported fatigue, tightness in her chest that was relieved by rest,

and occasional skipped heart beats. (Tr. at 938). Dr. Karam expressed grave concern that Claimant's coronary artery disease and valvular disease had significantly progressed. (Tr. at 940). He was so concerned about the status of her disease in February 2010 that he decided to forgo a stress test. Instead, Dr. Karam increased Claimant's medications, urged her to avoid exertion, and instructed her to go to the emergency room if she experienced any worsening symptoms. (*Id.*).

In April 2010, Claimant continued to complain of baseline dyspnea on exertion, but she denied chest pain or tightness since her last visit. (Tr. at 933). Dr. Karam opined that Claimant's mitral valve disease was becoming "very significant" and probably required further intervention. (Tr. at 933-34). During both visits, Dr. Karam discussed the need for catheterization, but Claimant was resistant to undergoing the procedure due to her lack of health insurance and the resulting financial burden. (Tr. at 934-35, 940).

The ALJ's belief that Claimant failed to seek specialized care, lacked significant cardiac symptoms, and required only conservative care clearly informed the ALJ's conclusion that Claimant's allegations regarding her cardiac impairments were not credible. However, Claimant's complaints regarding dyspnea and chest pain as recorded by Dr. Karam, the notes regarding Claimant's deteriorating condition, and Claimant's financial inability to undergo cardiac procedures, like catheterization, were not considered by the ALJ in assessing Claimant's credibility. Indeed, because the ALJ did not have access to the specialist's notes, the ALJ relied largely on the findings of Claimant's primary care physician to conclude that Claimant's only "potential cardiac symptom[]" was dizziness and that Claimant was treated conservatively and only by her primary care physician.

As outlined above, the new evidence submitted to the Appeals Council undermines the weight given by the ALJ to the evaluations performed by Claimant's primary care physician and presents a fundamentally different picture of Claimant's cardiac condition. As the ALJ's credibility finding influenced Claimant's RFC determination, and the RFC determination impacted the subsequent steps of the sequential evaluation process, the undersigned cannot find the error to be harmless, or the ALJ's decision to be supported by substantial evidence. Clearly, the importance of Dr. Karam's treatment records must be considered, and the evidentiary weight of those records must be assessed. Given that the Court does not weigh the evidence or resolve conflicts in the record, the case must be remanded to allow the ALJ to consider the new evidence and reconcile the conflicts. Although the new evidence ultimately may not change the disability determination, it is not inconceivable at this time that a different administrative conclusion may be reached when the record is considered as a whole. *See, e.g., Huffman v. Colvin,* No. 1:10CV537, 2013 WL 4431964, at *4 (M.D.N.C. Aug. 14, 2013) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.")

**VIII.  Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, to the extent that it requests remand, (ECF No. 12); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 13); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if mailed) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** December 12, 2016

Cheryl A. Eifert
United States Magistrate Judge

25